**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

CONNIE L. SHELOR,

                Plaintiff,

v.                                   ACTION NO. 2:13cv297

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

                Defendant.

## OPINION AND ORDER

      Plaintiff Connie L. Shelor brought this action under 42 U.S.C. §§ 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to section 205(g) of the Social Security Act.  This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure following consent of the parties. ECF Nos. 13 and 14.  For the reasons set forth below, Plaintiff's Motion for Summary Judgment (ECF No. 9) is DENIED, Defendant's Motion for Summary Judgment (ECF No. 11) is GRANTED, and the decision of the Commissioner is AFFIRMED.

## I. PROCEDURAL BACKGROUND

      Ms. Shelor protectively applied for DIB on April 8, 2010, alleging disability since December 30, 2006, caused by anxiety, depression, panic attacks, fibromyalgia, arthritis, asthma, migraine headaches, vertigo, bulging disc in her neck, obsessive compulsive disorder, attention

deficit disorder, memory problems, and nerve damage in her left leg and foot.  R. 130-36, 168.[1]

Ms. Shelor's applications were denied initially and on reconsideration.  R. 91-107.  Ms. Shelor

requested a hearing by an Administrative Law Judge (ALJ), which occurred on December 2,

2011.  R. 58-87.  Ms. Shelor was represented by counsel, and testified before the ALJ along with

a vocational expert.  R. 58.

On January 10, 2012, the ALJ found that Ms. Shelor was not disabled within the meaning

of the Social Security Act from December 30, 2006, the alleged onset date, through the date last

insured, December 31, 2011. R. 31.   The Appeals Council denied Ms. Shelor's request for

administrative review of the ALJ's decision.  R. 2-7.  Therefore, the ALJ's decision stands as the

final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. § 405(g); 20

C.F.R. § 404.981 (2012).

Ms. Shelor timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g).  On

November 5, 2013, Ms. Shelor moved for summary judgment asserting the ALJ improperly

assessed Ms. Shelor's shoulder impairment and improperly considered the opinions of the state

agency non-examining physicians.  ECF No. 9.  Defendant filed a cross-motion for summary

judgment on December 6, 2013, contending the ALJ appropriately considered the evidence and

the resulting opinion is supported by substantial evidence in the record.  ECF No. 11.  As neither

counsel in this case has indicated special circumstances requiring oral argument, the case is

deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Born in 1961, Ms. Shelor was forty-five years old on her alleged onset date of December

30, 2006.  R. 130.  Ms. Shelor received a GED, and has past relevant work experience as a deli

---

[1] The citations in this Report and Recommendation are to the Administrative Record.

and bakery clerk; cook, manager, and cashier of a billiards parlor; and, ticket collector at a parking garage. R. 62.

### A. Medical Background

Prior to Ms. Shelor's alleged onset date, from March 2006 through October 2006, she was treated at Churchland Psychiatric Associates for anxiety and depression. R. 277-290. At her appointment on October 12, 2006, Ms. Shelor reported her anxiety and mood symptoms were well controlled, her emotions were better controlled, her neck pain had lessened, and her headaches were less frequent. R. 277. Her therapist noted her symptoms were resolving and she was tolerating medications well. R. 277. Ms. Shelor was encouraged to continue medications and re-engage in therapy. R. 277.

Ms. Shelor was treated at the Spine Center of Hampton Roads in April 2006 for pain in her lower back, right buttock, shoulders and between her shoulder blades. R. 294. On examination, Ms. Shelor had a good range of motion in her upper and lower extremities, with normal affect, normal gait, and no pain behaviors. R. 295.

X-rays of Ms. Shelor's thoracic spine on April 3, 2006, revealed osteophytes, but preserved disc spaces, intact pedicles, and no paraspinal stripe widening. R. 272. The results were summarized as a degenerative change with no acute bony abnormality. R. 272. On April 6, 2006, x-rays of Ms. Shelor's cervical spine revealed a narrowing of the disc space at C6-7, anterior and posterior osteophytes with some encroachment upon the neural foramina bilaterally, and no evidence of fracture, dislocation, or soft tissue swelling. R. 274. The same day, x-rays of Ms. Shelor's lumbar spine revealed appropriately positioned metal cages at the L4-5 and L5-S1 disc spaces, considerable facet arthritis involving the lower lumbar spine and possible spinal

stenosis at L5-S1.  R. 273.

A cervical MRI, performed on April 19, 2006, revealed prominent right central disc/spur at C3-4 with potential neural impingement and right foraminal stenosis, and disc and osteophyte complex at C6-7, causing right greater than left foraminal stenosis.  R. 270-71.  A lumbar MRI performed the same day revealed normal alignment, and a mild spinal stenosis at L3-4.  R. 266-67.

After reviewing the MRIs, on April 26, 2006, Anuradha K. Datyner, M.D., Ph.D., with the Spine Center of Hampton Roads, assessed degenerative changes at multiple levels in Ms. Shelor's spine, depression, anxiety, and chronic pain.  R. 293.  Dr. Datyner found Ms. Shelor's depression and anxiety were affecting her pain, and noted Ms. Shelor was seeing a psychologist and psychiatrist for her depression.  R. 293.  Dr. Datyner outlined treatment options as physical therapy, medications, and spinal injections, and did not recommend surgical intervention.  R. 293.

During an examination with Dr. Datyner on October 24, 2006, Ms. Shelor indicated she was feeling better and wished to return to work as a Kroger deli-bakery manager.  R. 292.  A physical examination showed Ms. Shelor was neurologically intact.  R. 292.  Dr. Datyner prescribed Celebrex for back pain, and indicated she would see Ms. Shelor back as needed.  R. 292.

Ms. Shelor's alleged onset date is December 30, 2006; however, the next treatment notes in the record are from January 2009.  In January and April 2009, Ms. Shelor was seen at Portsmouth Orthopaedic Associates for right shoulder pain dating back to an injury in 2007, when a box fell on her arm while she was working at Kroger.  R. 302, 326.  Ms. Shelor exhibited

4

joint tenderness and pain on abduction and flexion greater than 90 degrees.  R. 302.  She was diagnosed with right shoulder bursitis and acromioclavicular joint arthritis.  R. 302, 326.  An MRI revealed no evidence of any kind of tear, and although she had some AC joint arthritis, the AC joint was not particularly tender.  R. 302.  She was given a steroid injection in her right shoulder, which did not alleviate her pain.  R. 302, 326.

From March through October 2009, Ms. Shelor was treated by Margaret Stiles, M.D., at Churchland Family Practice, for right shoulder pain, migraines, asthma, Vitamin D deficiency, fibromyalgia, and anxiety.  R. 304-313.  Ms. Shelor reported that her asthma symptoms were "ok" when she was on Advair.  R. 312.  Having previously tried Zoloft, Prozac, and Celexa, Ms. Shelor was prescribed Xanax.  R. 308-309.  She was also given some sample medications to treat her migraines.  R. 309.  In September 2009, she reported that her fibromyalgia was better on her current medications, and her anxiety had improved on Wellbutrin.  R. 305.  In October 2009, Ms. Shelor was seen for a cough, which she believed may be bronchitis.  R. 304.  She was tearful and tremulous, discussing her husband recently losing his job.  R. 304.  She was prescribed Medrol, a Z-pack, and Robitussin.  R. 304.

Ms. Shelor's daughter, Raelena Pavey, completed a function report on May 3, 2010, discussing Ms. Shelor's daily activities and abilities.  R. 187-94.  Ms. Pavey indicated Ms. Shelor's daily activities included dressing and grooming herself, making her meals, taking care of pets, watching television, reading mail, washing dishes, resting, and talking on the phone.  R. 187.  She stated Ms. Shelor occasionally ran errands and read.  R. 187.  She indicated Ms. Shelor had difficulty sleeping, and needed help with shoes, socks, necklace clasps, styling hair, shaving legs, and getting up from the toilet.  R. 188.  Ms. Shelor could drive, shop for groceries, pay

bills, count change, sweep the floor, load the dishwasher, make the bed, clean sinks and countertops, and plant plants in the Spring.  R. 189-90.  Ms. Pavey indicated Ms. Shelor's pain, vertigo, migraines, and arthritis made almost all physical tasks difficult.  R. 192.  Ms. Shelor had difficulty comprehending and following instructions, did not get along well with authority figures, had anxiety attacks and claustrophobia.  R. 193.  Ms. Shelor's sister, Nancy McNeely completed a function report on December 21, 2010, making essentially the same observations about Ms. Shelor's daily activities and abilities.  R. 218-28.

On June 26, 2010, Hani Souri, M.D., conducted a consultative examination of Ms. Shelor.  R. 336-40.  The examination revealed clear lungs, a symmetric, steady gait, good hand-eye coordination, and five out of five muscle strength in all areas tested.  R. 338-39.  Ms. Shelor was alert, had good eye contact, fluent speech, appropriate mood, clear thought processes, normal memory, good concentration, and she was oriented to time, place, person and situation. R. 339.    Ms. Shelor's sensory examination was normal, straight leg testing was negative, reflexes were symmetric, and range of motion was normal in all areas except her shoulder.  R. 340.  She stated she could not perform the full range of motion in her shoulder due to arthritis. R. 340.  Ms. Shelor had no joint swelling, erythema, effusion, tenderness or deformity.  R. 340. She could lift, carry and handle light objects, was able to rise from a sitting position without assistance, and had no difficulty getting on or off the exam table.  R. 340.  She could dress and undress, tandem walk, and hop on either foot bilaterally, but was unable to squat due to pain.  R. 340.  Dr. Souri noted Ms. Shelor did not give good effort during the examination.  R. 340.  Dr. Souri concluded Ms. Shelor could sit for two hours, stand for two hours, and walk for two hours at a time in an eight-hour workday before requiring a break; she could carry twenty pounds

frequently and thirty pounds occasionally; and, had no manipulative limitations on reaching, handling, feeling, grasping, or fingering.  R. 340.  Dr. Souri found Ms. Shelor could only occasionally bend, stoop, or crouch.  R. 340.

On July 3, 2010, Jeffrey S. Goodman, Ph.D., performed a consultative psychological examination of Ms. Shelor.  R. 342-49.  She arrived on time, having driven herself, was neat, clean and intelligible, but tense and anxious during the examination.  R. 346.  Dr. Souri noted that Ms. Shelor "display[ed] fairly significant symptoms of both anxiety and depression."  R. 346.  Dr. Goodman assigned Ms. Shelor a GAF of 49, and concluded that until she was able to address her issues in "more encompassing psychological treatment," she "will probably not be successful in returning to competitive employment."  R. 348.  Lastly, Dr. Goodman stated Ms. Shelor's psychiatric problems would negatively impact any work effort as she was inconsistent in completing even simple tasks due to distraction, would have difficulty attending work regularly due to anxiety, depression and her physical complaints, would have difficulty accepting instruction, and her ability to interact with others and deal with stress in a competitive work setting were compromised.  R. 349.

On July 16, 2010, state agency physician Karen Sarpolis, M.D., reviewed Ms. Shelor's record and filled out portions of a physical RFC assessment.  R. 351-57.  Dr. Sarpolis left the majority of the seven-page form blank, but did find that Ms. Shelor suffered from shoulder arthritis and should never climb ladder, ropes or scaffolds.  R. 352, 354.  Dr. Sarpolis also found Ms. Shelor's statements regarding her limitations were "partially credible."  R. 356.

In June, July and October 2010, Ms. Shelor was treated at Churchland Family Practice for asthma, depression, anxiety, vitamin D deficiency, and fibromyalgia.  R. 382-84.  She

reported having been off of many of her medications due to no insurance, but had started back on Wellbutrin and Neurontin. R. 386-82.

On December 21, 2010, a non-examining state agency physician,  reviewed Ms. Shelor's medical record and completed a Disability Determination Explanation indicating Ms. Shelor was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for two hours, and sitting for six hours in an eight-hour workday. R. 98.  The assessment further limited Ms. Shelor's reaching overhead on the right side, and restricted any climbing because her shoulder could not bear weight. R. 99.  The physician determined Ms. Shelor was not disabled. R. 100.

On February 4, 2011, Ms. Shelor was treated by Margaret Stiles, M.D., at Churchland Family Medicine. R. 412-14.  Ms. Shelor reported anxiety, depression, asthma, foot pain, headaches, shoulder pain, and fatigue. R. 412.  Examination revealed pain in the right groin, pelvic region, and thigh consistent with hip arthritis. R. 414.  Ms. Shelor was instructed to continue medications, consider counseling, and consider a joint injection for her hip pain. R. 414.

Dr. Stile's examination of Ms. Shelor on February 16, 2011, revealed good judgment, normal mood and affect, limited ambulation, limited range of motion, neck pain, back pain, and pain consistent with hip arthritis. R. 411.  Again, Ms. Shelor was advised to continue medications, proceed with counseling, and to consider a joint injection for her hip pain. R. 411.

The same day, Dr. Stiles filled out a Medical Source Statement regarding Ms. Shelor's physical limitations. R. 400-403.  Dr. Stiles indicated Ms. Shelor could occasionally lift up to ten pounds and could rarely lift up to twenty pounds, could walk one-half of a city block or sit

for fifteen minutes before needing to rest, could stand or walk for a total of two hours and sit for a total of two hours in an eight-hour work day, and would need to take multiple breaks.  R. 400-401.  Due to medication, Dr. Stiles indicated Ms. Shelor could reasonably be expected to experience sleepiness or fatigue, dizziness, confusion, and concentration difficulties.  R. 401.  Ms. Shelor should only rarely look down, turn her head to the left, twist, stoop, push or pull.  R. 402-403.  She should never turn her head to the right, crouch, squat, crawl, kneel, or climb stairs, ladders or scaffolds.  R. 402-403.  Due to her claustrophobia, fear of heights, and asthma, Ms. Shelor should avoid fumes, odors, gases, chemicals, dust, humidity, temperature extremes, or hazards such as machinery or heights.  R. 403.  Dr. Stiles indicated she had been treating Ms. Shelor since March 2009, and that Ms. Shelor had experienced these limitations for over five years.  R. 403.

On February 16, 2011, Dr. Stiles also completed a form Medical Assessment of Ability to do Work-Related Activities in light of Ms. Shelor's mental limitations.  R. 405-407.  Dr. Stiles indicated that due to anxiety and panic attacks, Ms. Shelor had poor or no ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember and carry out complex or detailed job instructions, behave in an emotionally stable manner, or demonstrate reliability.  R. 405-406.  Although, Dr. Stiles did find Ms. Shelor could manage benefits in her own best interests.  R. 407.

Ms. Shelor was seen by Dr. Stiles in March 2011 for asthma and medical clearance for shoulder surgery.  R. 508-511.  Dr. Stiles continued Ms. Shelor on her current asthma medications and added a short course of steroids.  R. 501.  Due to an upper respiratory infection,

9

she recommended putting the shoulder surgery on hold for a week.  R. 510.

Ms. Shelor was referred to physical therapy following surgery on her right shoulder, and completed an initial evaluation on April 29, 2011.  R. 444.  Ms. Shelor participated in eight sessions of physical therapy in May 2011, where she progressed and obtained an excellent range of motion.  R. 428-38, 443.

Ms. Shelor began counseling sessions with Churchland Psychiatric Associates, P.C., in April 2011.  R. 462.  Notes from her initial assessment indicate Ms. Shelor was having problems with her marriage, and had recently undergone arthroscopic shoulder surgery.  R. 462.  During her first session, her therapist checked boxes to indicate Ms. Shelor exhibited the following symptoms: anger, anxiousness, chronic pain, depressed mood, isolation, panic attacks, migraines, and weight gain.  R. 461.  Ms. Shelor stated she was depressed because of her weight.  R. 461.  She tried exercise, but it caused too much pain.  R. 461.  She indicated she did not want to leave the house, and that her husband of twenty-one years caused daily stress and anger, but she could not leave due to finances.  R. 461.

Counseling notes from May 2011 indicate Ms. Shelor underwent surgery for kidney stones, which caused stress due to a lack of insurance.  R. 459-60.  She found it hard to hold her temper, had an altercation with her brother, and felt her entire family was against her.  R. 460.  She was experiencing nightmares, and not resting well as a result.  R. 458-59.  She discussed a sexual assault that occurred when she was sixteen.  R. 458.  She indicated she felt better, but still did not want to get out of bed often.  R. 458.

On June 9, 2011, Ms. Shelor also indicated she was feeling better.  R. 457.  Progress notes from June 9 and July 19, 2011, indicate Ms. Shelor was alert and cooperative, had

appropriate eye contact and a neat appearance, her speech was spontaneous, her thought processes logical, her mood was euthymic and her affect congruent, her memory and concentration were adequate, and her insight and judgment were fair.  R. 454, 457.  She had no hallucinations, delusions, suicidal ideations or homicidal ideations.  R. 454, 457.

On June 15, 2011, Ms. Shelor attended physical therapy to be instructed on how to use a home cervical traction device prescribed by her physician.  R. 427.  Ms. Shelor did not wish to attend physical therapy, but was instructed on a home exercise program.  R. 427.  Ms. Shelor indicated in the intake questionnaire that she suffered from pain and numbness in her neck, head, shoulders, arms and hands.  R. 420.  Her discharge summary on June 24, 2011, indicated Ms. Shelor had excellent passive range of motion in her right shoulder, and was waiting for her doctor to prescribe treatment for her neck.  R. 426.

On June 21, 2011, Ms. Shelor's counseling notes state the pain in her back and neck were worse, and she was suffering from fibromyalgia and migraines.  R. 456.  The pain was not as bad in July 2011, but Ms. Shelor indicated she was having difficulty remembering to turn off the stove and to pay bills.  R. 455.  In August 2011, her back and neck pain caused her to sit on the edge of her chair.  R. 453.  Ms. Shelor stated vertigo, asthma, back pain, and neck pain prevented most activity.  R. 453.  She was anxious about driving through the tunnel or driving on bridges.  R. 453.

A chest x-ray in August 2011 showed no acute cardiopulmonary process and clear lung fields.  R. 472.  Pulmonary function tests performed in September 2011 were normal with normal flows, volumes, and diffusion capacity.  R. 472.  Amit D. Patel, M.D., a pulmonary specialist, referred Ms. Shelor for a sleep study, increased the dosage of her inhaler, encouraged her to

increase her activity and consider measures to reduce her weight.  R. 472.

Ms. Shelor had monthly appointments with Churchland Psychiatric Associates from August 2011 through November 2011.  R. 482-86.  Therapy notes indicate Ms. Shelor was anxious, in pain, depressed, experiencing concentration and memory problems, and having nightmares.  R. 486.  Ms. Shelor indicated she was stressed due to her husband, her family, gall bladder surgery, and pain in her neck and arm.  R. 482-86.  Her September 2011 progress note continues to indicate Ms. Shelor was alert and cooperative, had appropriate eye contact and a neat appearance, her speech was spontaneous, her thought processes logical, her mood was euthymic and her affect congruent, her memory and concentration were adequate, and her insight and judgment were fair.  R. 484.

Ms. Shelor was treated by Wayne T. Johnson, M.D., in August 2011 for shoulder pain. R. 493.  Despite some discomfort, Ms. Shelor's range of motion was normal, and her portal sites looked "quite good," with no inflammation.  R. 493.  Her internal and external rotation were essentially pain free.  R. 493.  Dr. Johnson recommended Naprosyn and use of heat.  R. 493.

Ms. Shelor again saw Dr. Johnson in October 2011 for shoulder, hip and buttocks pain. R. 489.  Physical examination of her shoulder showed no tenderness, swelling, or increased warmth.  R. 489.  Range of motion of both hips was normal, her gait was normal, and a standing AP pelvis radiograph showed no hip arthritis.  R. 489.  After discussing options, Ms. Shelor elected a Cortisone injection for what Dr. Johnson suspected was residual inflammation from her shoulder surgery.  R. 489.  Dr. Johnson recommended conservative care for her hip pain, including heat.  R. 489.

Ms. Shelor was also treated by Reeta M. Arora, M.D., with Virginia Orthopaedic and

Spine Specialists in October 2011 for neck pain and poor balance.  R. 491.  Ms. Shelor indicated that while her right hand numbness had gotten better, it was coming back with intermittent weakness.  R. 491.  Physical examination showed pain with extension and left lateral bending, but negative Spurling's sign, negative Hoffman's sign, no difficulty with tandem gait, symmetrical deep tendon reflexes, and upper extremity strength of four out of five.  R. 491.  Dr. Arora diagnosed cervical spondylosis with a flare of right-sided radiculopathy.  R. 491.  Dr. Arora changed Ms. Shelor's pain medication and referred her for a "refresher course" of physical therapy.  R. 491.

In November 2011, Ann D. Mingione, Ph.D., completed a Medical Assessment of Mental Ability to do Work-Related Activities.  R. 513-16.  Dr. Mingione found Ms. Shelor was limited in her ability to follow work rules, use judgment with the public, function independently, understand, remember and carry out simple job instructions, maintain personal appearance, and relate predictably in social situations.  R. 513-14.  Dr. Mingione further found Ms. Shelor was seriously limited in her ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember, and carry out detailed or complex job instructions, and demonstrate reliability.  R. 513-14.  Dr. Mingione found Ms. Shelor's medications caused sleepiness, fatigue, headaches, weight changes, dizziness, confusion, agitation, concentration difficulties, and insomnia.  R. 515.  Dr. Mingione concluded Ms. Shelor forgets what she is supposed to do while cooking, has problems focusing, is isolative around the home, and "cannot work."  R. 515.

Dr. Stiles completed a Medical Source Statement regarding Ms. Shelor's physical limitations in November 2011.  R. 518-21.  Dr. Stiles indicated Ms. Shelor had been diagnosed

with fibromyalgia, headaches, and asthma, and had undergone two back surgeries.  R. 518.  Dr. Stiles found Ms. Shelor could occasionally lift up to ten pounds, and rarely lift twenty pounds.  R. 518.  Ms. Shelor could stand or walk less than two hours in an eight-hour workday and sit less than two hours in an eight-hour workday.  R. 518.  Ms. Shelor's medication side effects included sleepiness, fatigue, dizziness, confusion, and concentration difficulties, which would interfere with the attention and concentration needed to perform even simple work tasks.  R. 519.  Ms. Shelor would need multiple unscheduled breaks.  R. 519.  Ms. Shelor should only occasionally use her right hand, and only rarely use her left hand, to grasp, turn, or twist objects, for fine manipulation, or to handle objects.  R. 520.  She could only rarely look down, turn her head to the left, twist, stoop, push or pull.  R. 520.  She should never turn her head to the right, crouch, squat, crawl, kneel, or climb stairs, ladders or scaffolds.  R. 520-21.  Due to her claustrophobia, fear of heights, asthma and migraines, Ms. Shelor should avoid fumes, odors, gases, chemicals, dust, humidity, temperature extremes, or hazards such as machinery or heights.  R. 521.  Dr. Stiles indicated she had been treating Ms. Shelor since March 2009, and that Ms. Shelor had experienced these limitations for over five years.  R. 403.

On December 1, 2011, due to neck pain radiating into Ms. Shelor's left arm with numbness, an MRI was performed on her thoracic spine.  R. 523-32.  The MRI showed mild enhancement of the right S1 nerve root, but no definite impingement of the nerve was demonstrated.  R. 523.  In reviewing the MRI results, Dr. John K. Plemmons, M.D., concluded "[a]s the clinical symptoms referenced in history are left-sided, finding is of uncertain clinical significance if any."  R. 523.

**B.      The Administrative Hearing – December 2, 2011**

During the administrative hearing, counsel informed the ALJ that Ms. Shelor suffered from cervical issues and problems involving her hands, in addition to the list of impairments given on her application, including anxiety, depression, fibromyalgia, degenerative joint disease, arthritis in the right shoulder, neck, mid and low back and hip, asthma, migraine headaches, vertigo, obsessive compulsive disorder, attention deficit disorder, memory problems, and nerve damage in the left leg and foot.  R. 62-63.  Ms. Shelor testified that she had to stop working as a deli and bakery head clerk due to issues with her neck and back, severe anxiety, panic attacks, and pain in her hips and shoulder.  R. 63.

At the time of the hearing, Ms. Shelor lived with her husband and twenty-six year old daughter.  R. 63-64.  She was five foot five inches tall and weighed two-hundred and sixty pounds.  R. 64.

Ms. Shelor testified that she could lift ten pounds, but had difficulty standing and walking due to pain in her back, hips, and feet, as well as asthma.  R. 69.  Ms. Shelor testified that she could walk less than a block before needing to stop and rest, and could sit less than twenty minutes before needing a break.  R. 78-79.  Sitting could cause her back, hips and legs to hurt, especially her left leg, which goes numb.  R. 70.  In addition, three fingers on Ms. Shelor's left hand were numb, and her right hand had intermittent pain making it difficult to handle small items like jewelry and buttons.  R. 79.  She also needed help putting on her shoes and socks.  R. 68.

Ms. Shelor testified that her medications helped.  R. 65-66.  She had constant back and neck pain, which was eased to a tolerable level by taking Vicodin.  R. 70.  She also took

Naproxen when the discs in her neck were swollen and causing headaches.  R. 71.  However, Ms. Shelor stated the medications made her tired, dizzy and confused.  R. 71.

She took two naps per day lasting from thirty minutes to two hours, had difficulty sleeping at night, and had been diagnosed with mild sleep apnea.  R. 72-73.  Ms. Shelor had a hard time focusing, experienced panic attacks two to five times each week, and migraine headaches one to three times per week.  R. 73, 75.

She drove only short distances due to back and neck pain as well as numbness in her hip and leg.  R. 68, 76.  In addition, she could become confused or have panic attacks when driving. R. 78.  She helped with the housework by sweeping the kitchen, washing dishes, putting laundry in the washer, or dusting.  R. 67.  She could only cook using the microwave due to previously causing a small fire on the stove and burning her hand.  R. 77.  Her daughter helped Ms. Shelor shop, by helping her find her way as well as loading and unloading groceries.  R. 68, 78.  Ms. Shelor could not manage a checkbook.  R. 78.  She watched a little television and read.  R. 67-68.

Ms. Shelor visited her mother, but did not socialize otherwise.  R. 68.  She had difficulty communicating with people, got angry fast, and sometimes felt embarrassed and depressed as a result.  R. 77.  She related an episode where her coworkers locked her in the freezer at Kroger and turned the lights out, which has caused her to have nightmares where she felt she was suffocating.  R. 75.

A vocational expert, Ms. Paula Day, testified that Ms. Shelor's past relevant work as a cook, manager and cashier of a restaurant was skilled, medium work.  R. 81.  Her work as a deli and bakery clerk was semiskilled, heavy work, and her work as a ticket collector was unskilled,

light work.  R. 82.  The ALJ asked whether there were jobs available for a hypothetical person with Ms. Shelor's age, education, and work experience who was capable of a limited range of light work, who could lift and carry ten pounds frequently and twenty pounds occasionally, could sit for eight hours in an eight-hour day and could walk or stand for four hours in an eight-hour day, who would need to alternate sitting and standing at least every thirty minutes, and who could not climb or work at unprotected heights or around dangerous machinery, could only occasionally bend or squat, and was limited to simple, repetitive, non-production job tasks without frequent interaction with the public.  R. 82.  The vocational expert testified jobs were available for a person with those limitations, including mail clerk, warehouse checker, and office helper.  R. 83.  The vocational expert testified that, based on her experience and job analysis, these jobs would allow for alternating sitting and standing.  R. 83.

The vocational expert testified that the additional limitations of inconsistency in completing even simple work tasks, difficulty attending work regularly and consistently due to anxiety and depression, difficulty accepting instructions, and difficulty dealing with stress in a competitive work setting, would preclude all competitive work.  R. 84.  Further, all jobs would be eliminated if the hypothetical person were seriously limited in relating to coworkers, dealing with the public, interacting with supervisors, dealing with work stresses, and maintaining attention and concentration.  R. 85.  The vocational expert also testified that absence from work two or more days per month, or being off-task fifteen to twenty percent of the workday would eliminate any employment.  R. 85.

### III.  <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to

17

determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Commissioner." *Hancock*, 667 F.3d at 472 (citations omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Hancock*, 667 F.3d at 476 (citations omitted). Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman v. Brown,* 829 F.2d 514, 517 (4th Cir. 1987).

To qualify for disability insurance benefits ("DIB"), an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a

"disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. 20 C.F.R. § 404.1520; *Mastro*, 270 F.3d at 177. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. *Id.* An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. *Id.* Affirmative answers to questions three or five establish disability. The claimant bears the burden of proof through step four of the analysis; the burden then shifts to the Commissioner at step five. 20 C.F.R. § 404.1520. With this standard in mind, the Court will address Ms. Shelor's arguments.

# IV. <u>ANALYSIS</u>

The ALJ found Ms. Shelor was not disabled, as defined by the Social Security Act, from December 30, 2006, the alleged onset date, through December 31, 2011, the date last insured.  R. 31.  At step one of the five-step analysis, the ALJ concluded that Ms. Shelor did not engage in substantial gainful activity from December 30, 2006, through December 31, 2011.  R. 22.  At step two, the ALJ found that Ms. Shelor's degenerative disc disease, obesity, fibromyalgia, depression, and anxiety were severe impairments.  R. 22.  The ALJ found Plaintiff's other impairments were non-severe.  R. 23.  At the third step, the ALJ concluded Ms. Shelor did "not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 23.

The ALJ found that, through the date last insured, Ms. Shelor had the residual functional capacity ("RFC") to perform a limited range of light work.  R. 25.  In reaching this conclusion, the ALJ summarized Ms. Shelor's testimony regarding her symptoms, including pain.  R. 25-26.  The ALJ found Ms. Shelor's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible.  R. 26.

The ALJ next summarized Ms. Shelor's medical history, including treatment notes, consultative examination notes, and state agency physicians.  R. 26-30.  Lastly, the ALJ discussed the function reports submitted by Ms. Shelor's daughter and sister.  R. 30.  The ALJ concluded Ms. Shelor could perform a limited range of light work, but found Ms. Shelor was not capable of performing any of her past relevant work at step four.  R. 30.  The ALJ found at step five that, with Ms. Shelor's age, education, and residual functional capacity, there were jobs that exist in the national economy she could perform, such as mail clerk, warehouse checker, and

office helper.  R. 31.

Ms. Shelor asserts (1) the ALJ erred by failing to find Ms. Shelor suffered from a severe impairment of her right upper extremity; and, (2) the ALJ failed to properly address the opinions of the state agency non-examining physicians.  Pl.'s Mem. 2.  The undersigned disagrees, finding there is substantial evidence in the record to support the ALJ's decision with regard to Ms. Shelor's shoulder impairment and the state agency non-examining physicians.

**A.      The ALJ Did Not Commit Reversible Error at Step Two When He Found Ms. Shelor's Shoulder Impairment was Non-Severe**

Ms. Shelor asserts the ALJ erred in finding Ms. Shelor's shoulder impairment was "nonsevere."  Pl.'s Mem. 9-11; R. 23.  At the second step of the sequential analysis, the ALJ must determine whether the claimant has a severe impairment.  *See* 20 C.F.R. § 404.1520.  An impairment is severe if it "significantly limit[s] your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  An impairment is not severe if it "has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1982).  The Court finds the ALJ did commit error in finding Ms. Shelor's shoulder impairment was not severe.  However, because the ALJ found Ms. Shelor had other severe impairments, and appropriately addressed her shoulder impairment throughout the remainder of his decision, the error was harmless.

Though the ALJ found Ms. Shelor's shoulder impairment was not a severe impairment, he found Ms. Shelor had several other severe impairments and continued with the sequential evaluation process.  R. 22.  Courts have determined that failing to find a particular impairment to be severe at step two is harmless error as long as the ALJ considers the combined effect of all impairments throughout the remaining steps of the process.  *See Maziarz v. Sec'y of Health &*

*Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding ALJ's erroneous conclusion that some of Plaintiff's impairments were non-severe could not constitute reversible error where ALJ identified other severe impairments, and considered all impairments in the remaining steps of the analysis); *Cook ex rel A.C. v. Colvin*, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) (finding, "[t]he failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process.").

The ALJ appropriately considered Ms. Shelor's shoulder impairment throughout the remainder of the five-step analysis. *See* 20 C.F.R. § 416.945(a)(2). At step three, the ALJ evaluated Ms. Shelor's physical impairments, and found they did not rise to the level of a listing, specifically citing Listing 1.00 for the Musculoskeletal System. R. 23.

In determining Ms. Shelor's RFC, the ALJ considered, that Ms. Shelor was given a cortisone injection for right shoulder bursitis in April 2009, and discussed the results from an MRI of her shoulder. R. 27, 302-303. The ALJ summarized findings following a consultative physical exam that Ms. Shelor had no palpable muscle spasm, full muscle strength (5/5) in her arms and hands bilaterally, no joint swelling, erythemia, effusion, tenderness or deformity. R. 27, 340. The ALJ discussed the consultative examiner's findings that Ms. Shelor could lift, carry and handle light objects, could dress and undress adequately, and had no manipulative limitations on reaching. R. 27, 340. The ALJ noted that following arthroscopic surgery on her right shoulder, and physical therapy, Ms. Shelor obtained an "excellent passive range of motion," and four out of five muscle strength in her upper extremities. R. 28, 426-27, 430. He discussed

that in August 2011, Ms. Shelor's internal and external rotation were essentially pain free.  R. 493.  Lastly, the ALJ considered that Ms. Shelor received a steroid injection in October 2011 for what her doctor suspected was residual inflammation from her shoulder surgery, and examination revealed the shoulder showed no tenderness, swelling, or increased warmth, and Ms. Shelor had nearly full flexion and abduction.  R. 28, 489.

The ALJ appropriately addressed all of the evidence in the record regarding Ms. Shelor's shoulder impairment at steps three, four, and five.  R. 25-29.  Accordingly, the ALJ's error at step two of the analysis was harmless, and Ms. Shelor's motion for summary judgment due to the ALJ's failure to find Ms. Shelor's shoulder impairment was severe is DENIED.

### B.       The ALJ Properly Considered the Opinions of the Non-Examining State Agency Physicians

Next, Plaintiff asserts the ALJ erred by not adopting certain portions of the findings made by two non-examining State agency physicians.  Pl.'s Mem. 12-13.  Specifically, Plaintiff contends the ALJ failed to explain why the reaching limitation, and the standing and walking limitation contained in the opinions, were not adopted in the RFC despite the ALJ assigning the opinions moderate weight.  Pl.'s Mem. 12.

Plaintiff is correct that the ALJ cannot ignore the opinions of the non-examining state agency physicians, and must explain the weight assigned to the opinions.  Pl.'s Mem. 12; *See* 20 C.F.R. §§ 404.1527(f)(2).  However, the ALJ is only required to consider State agency opinions when determining the RFC, and is not bound by such opinions if they are not consistent with the record.  SSR 96-6p (Policy Interpretation).  *See also Lambert-Newsome v. Astrue*, No. 11-1141, 2012 WL 2922717, at *6 (S.D. Ill. 2012) (assigning great weight to an opinion "does not mean [the ALJ] was required to adopt it wholesale").  In Ms. Shelor's case, the ALJ appropriately

23

addressed these opinions, assigned them moderate weight, and explained the reasons for making his RFC assessment.  R. 25-30.

A Disability Determination Explanation completed by a non-examining state agency physician in December 2010 indicated Ms. Shelor was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for two hours, and sitting for six hours in an eight-hour workday.  R. 98.  The assessment limited Ms. Shelor's reaching overhead on the right side, and prohibited climbing ladders, ropes or scaffolds because her shoulder could not bear weight.  R. 99.  Similarly, a non-examining state agency physician indicated in July 2010 that Ms. Shelor suffered from shoulder arthritis and should never climb ladders, ropes or scaffolds.  R. 352, 354.

The ALJ assigned these opinions moderate weight, and restricted Ms. Shelor to jobs that did not require climbing, but found "the reaching limitations are not necessary due to objective clinical findings of near full range of motion in the shoulder."  R. 25, 29.  The ALJ further found Plaintiff could stand or walk for four hours in an eight-hour workday, with the option to alternate between sitting and standing every thirty minutes.  R. 25.  The ALJ noted, Ms. Shelor's "consistent reports of pain and difficulty sitting for prolonged periods supports a sit stand option."  R. 29.

The ALJ appropriately addressed Ms. Shelor's ability to stand, walk, and reach.  The ALJ considered Ms. Shelor's reports of pain in both feet and heels making it difficult to walk, and statements that she could walk less than a block and sit less than twenty minutes.  R. 26.  The ALJ summarized treatment records showing that, in 2009, Ms. Shelor was diagnosed with right shoulder bursitis and acromioclavicular joint arthritis, and was treated with a shoulder injection;

in 2010, during a consultative examination she had a symmetric steady gait, five out of five muscle strength in all muscle groups, was able to rise from a sitting position, had no difficulty getting on and off the examination table, was able to walk on heels and toes, and could hop on either foot bilaterally; and, in 2011, she had an excellent passive range of motion in her right shoulder following physical therapy and four out of five muscle strength in her upper extremities, and her hip pain was managed with conservative care including heat.  R. 26-28. The ALJ appropriately addressed the opinions of the non-examining state agency physicians, and substantial evidence in the record supports the ALJ's RFC assessment as it pertains to Ms. Shelor's ability to stand, walk, reach, and sit.  Accordingly, Ms. Shelor's motion for summary judgment due to the ALJ's failure to properly consider the opinions of the state agency non-examining physicians is DENIED.

## V. ORDER

For the foregoing reasons, the Court ORDERS that Ms. Shelor's Motion for Summary Judgment (ECF No. 9) is DENIED, Defendant's Motion for Summary Judgment (ECF No. 11) is GRANTED, and the final decision of the Commissioner is AFFIRMED.

_____/s/_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
September 24, 2014